1
2
3
4

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**

5

**FOR THE COUNTY OF CLACKAMAS**

6

| MARTY ORLUCK, dba COMPETITION AUTO BODY, | Case No. 20CV35387 |
|---|---|

**MARTY ORLUCK, dba COMPETITION**

7

**AUTO BODY,**

**Case No. 20CV35387**

8

Plaintiff,

**COMPLAINT** (unlawful trade practices, negligence, product liability)

9

**ORS 646.608**

v.

10

**AMOUNT CLAIMED:  $157,821.5**

11

**ILLINOIS TOOL WORKS** and **PPX, INC.**,

**CLAIM NOT SUBJECT TO MANDATORY ARBITRATION**

12

Defendants.

**JURY TRIAL REQUESTED**

13

**FILING FEE PAID ($594) PER ORS 21.160(C)**

14

15
16

Plaintiff brings this Complaint against Defendants and allege as follows:

17

1.

18
19

Defendants Illinois Tool Works (ITW) and PPX, Inc. are businesses selling and promoting goods and services in Clackamas County, OR.  Plaintiff resides and does business in Clackamas County and the events giving rise to this complaint occurred in Clackamas County, making jurisdiction proper per ORCP 4.

20
21
22

2.

23
24
25
26

Plaintiff operates a professional auto body repair service and has worked in the auto body repair and restoration industry for 37 years.  Defendant ITW is the owner of the "Evercoat" product line of auto primers and fillers.  Defendant PPX, Inc. sells and supports the Evercoat product line in Oregon.  Defendants market these products for use in the auto body restoration and collision repair industry.

**COMPLAINT, page 1**

3.

Beginning in 2015 or 2016, Plaintiff began using the 'Rage Ultra' and 'Rage Ultra XTRA' Evercoat products. These products are marketed as being used for auto body filler work. They are designed to be used for restoration and repair of automobile body parts and panels.

4.

Plaintiff was induced to purchase these products based on the representations of Defendants. These representations were made in various videos, statements of sales reps, product sheets, and other promotional materials, including, but not limited to:

-A promotional video shown during and after the 2015 Specialty Equipment Market Association (SEMA) trade show. In this video, Defendant's agent explicitly states that 'Rage Ultra XTRA' is designed for, "extra-long working time", "repair for large applications", and that it was the "perfect product" for doing "Restoration large swipes from one end of the vehicle to the other, all at one time." As of the filing of this complaint, this video was still posted and viewable on youtube.

-In November of 2015, Marvin Gillfillan, a vice president of Defendant ITW, stated, "Rage Ultra XTRA is part of our new proprietary dent repair system that features products that can be adapted for repairs of most any size or temperature condition. This system of products was developed for body shop technicians who need application flexibility, high quality, and increased productivity ... this system does it all."

-A product brochure for 'Rage Ultra' states that the product, "spreads easily and virtually eliminates micro-pinholes".

-This same brochure states that 'Rage Ultra XTRA' is, "Excellent for large repair areas".

-A product sheet published by Defendant for 'Rage Ultra' states it is made with a,

**COMPLAINT, page 2**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

"non-sag" formula.

-A product sheet published by Defendant ITW for 'Rage Ultra XTRA' states, "Manufacturers and technicians can mix and spread large quantities knowing they have enough time to work larger surfaces, saving time and increasing productivity."

5.

In addition, Defendant ITW's youtube channel (ITWEvercoat) posts videos advertising 'Rage Ultra' and 'Rage Ultra XTRA' as being designed for large area repairs and restoration work. As of the filing of this complaint, videos on this channel state, "Rage XTRA is also perfect for restoration work when repairing large areas like hoods or door panels"

6.

In fact, 'Rage Ultra' and 'Rage Ultra XTRA' are not suited for large area repair work. When applied to large areas, these products have multiple issues that lead to increased costs in both labor and materials, including:

1. The fillers resin structure sands away to quickly to control and maintain complex body lines, panel shapes, 1/4" builds, and contours.

2. Partial reapplications over prior-filled panel coats is problematic in that too much of the surrounding filler is sanded away when trying to block and shape into the existing Rage Ultra fillers. This creates the need for many more coats of the filler than would normally be necessary to maintain and rebuild those areas.

3. 'Rage Ultra' and 'Rage Ultra XTRA' viscosity and vertical hold is poor and not non-sag as claimed. This makes build and contouring problematic and deceptive because . . .the sagging creates thinner application coats and uneven builds. Mixing the two fillers at different mix ratios to vary working time also varies the viscosity. This creates a poor, deceptive, and varied build thickness, especially on the vehicles side and contoured top panels. Having such varied thickness makes any restoration work

**COMPLAINT, page 3**

problematic because it increases the amount of labor required to ensure an even build.

4. Use of these products has resulted in multiple cracking failures on non-stress repair areas of panels that have small amounts of normal vehicle flex. The filler failure takes place on the repair panel areas where the products are used.

The issues above have resulted in double the normal amount of application coats which has resulted in twice the amount of labor and twice the amount of materials used. These defects make both products unsuitable for their explicitly stated purpose.

7.

Based on the above representations of Defendants, Plaintiff used both products in accordance with Defendants' instructions to repair a 1966 Mustang beginning in 2019 and continuing through the summer of 2020. The products did not perform as advertised. Specifically:

-Three or more additional coats had to be applied to make up for the filler's performance deficiencies (as described in paragraph 6, above). This required Plaintiff to have to keep rebuilding and reshaping low areas, body lines, and contours of all the body panels.

-In addition, several of the body panels restored with the products ended up cracking and have to have all of the filler removed and a replacement filler reapplied.

-These deficiencies have doubled the amount of labor and materials required for this job. Plaintiff was forced to spend an additional 220.4 hours of work on the restoration job before it was completed and spend an additional $1200 on materials. Plaintiff's standard hourly rate for this type of work is $85 per hour, resulting in an economic loss to Plaintiff of $19,934.

8.

**COMPLAINT, page 4**

1

2

3

4

5

6

7

8

9

Since Plaintiff had to have this vehicle in his shop much longer than anticipated in order to have it properly restored, he was unable to take on other restoration work. This lost work has an economic value to Plaintiff of $30,600, representing 360 extra hours of work at Plaintiff's standard hourly rate of $85. In addition, Plaintiff has spent an additional 180 hours discussing these issues with Defendant and testing products (per Defendant's instructions) over the past year. But for Defendant's actions, Plaintiff could have spent this time on additional restoration work. The hours spent on this issue have an economic value to Plaintiff of $15,300 (180 hours x $85 per hour).

9.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Several times while Plaintiff was using the products, he contacted Mike Hamilton and Ed Paine (who are product representatives for Defendant PPX, Inc.) in an attempt to resolve the issues he was having with the products. Upon information and belief, Mr. Hamilton and Mr. Paine's job responsibilities include resolving technical issues with the products they sell. Both Mr. Hamilton and Mr. Paine failed to offer any guidance on how to correct the problems with the products. Mr. Paine eventually contacted Ed Medina (an employee of Defendant ITW) about Plaintiff's need for answers regarding the problems he was having with 'Rage Ultra' and 'Rage Ultra XTRA'.   Plaintiff was eventually contacted by Tim McKenney, an employee of Defendant ITW. Mr. McKenney represented to Plaintiff that he was a Labtech who worked in the Evercoat lab. After discussing the issues Plaintiff was having with the products, Mr. McKenney instructed Plaintiff to mix any of Defendant's fiber-filled fillers (a stronger filler that contains different types of fibrous threads for reinforcement) along with any filler in the metal works program (including 'Rage Ultra' and 'Rage Ultra XTRA') to improve the strength and sanding characteristics of 'Rage Ultra' and 'Rage Ultra XTRA'. Mr. McKenney informed Plaintiff that if he had time, he would make up something at the lab. He then said it would be quicker if Plaintiff tried mixing and testing mix ratios on his own. Plaintiff agreed to try these recommendations.

**COMPLAINT, page 5**

10.

Plaintiff followed Mr. McKenney's instructions on another restoration project, a '77 Mustang Cobra II, personally owned by Plaintiff. Unfortunately, these instructions did nothing to correct the previous problems. Mixing the fillers that contained the strengthening fibers appeared to work at first, but the fibers left craters in the body of the vehicle that showed up some time later. These craters would show up through any paint job and would almost certainly cause the paint to blister. Plaintiff will have to completely remove the applications of the fiber-mixed 'Rage Ultra' and 'Rage Ultra XTRA', and then apply a filler that is not compromised and designed for this type of filler work. This has again caused Plaintiff to lose profits from his restoration business, as he cannot remove his personal vehicle from the shop in order to take on new restoration projects. But for the representations of Defendants, Plaintiff would not have applied the fiber-mixed filler. Plaintiff will now have to remove the defective fiber body filler and then reapply a new filler. This will take Plaintiff a total of 269.5 hours, including 261.5 hours at his standard $85 per hour rate and 8 hours of work performing media blasting to remove the compromised filler at a standard rate of $125, per hour. Plaintiff will also need to spend an additional $3,135 in materials, for a total economic loss to Plaintiff of $26,362.5.

11.

Plaintiff repeatedly tried to contact Mr. McKenney to discuss these issues. Eventually, Plaintiff got in touch with another employee of Defendant ITW who worked as a lab manager named Carl Seabert. Plaintiff had called to discuss the filler formula changes and usage with regard to Mr. McKenney's recommendations and was informed by Mr. Seabert that mixing 'Rage Ultra XTRA' with fiber-reinforced fillers was not a good idea and should not be done. Plaintiff asked for clarification of the two contrasting statements from Mr. McKenney and Mr. Seabert. Mr. Seabert informed Plaintiff that he would consult with

**COMPLAINT, page 6**

Mr. McKenney and Plaintiff would receive a follow up call regarding this issue. No follow up call was ever made to Plaintiff.

12.

Several months after this conversation, Plaintiff was able to schedule a conference call on 6/19/20 with Ed Medina (a regional manager of Defendant ITW), Mr. Seabert, and Ed Paine. During this call, Mr. Seabert informed Plaintiff that Mr. McKenney was not a lab technician at all and actually had a different position with Defendant ITW unrelated to working in any lab and he did not have authority to answer lab-related questions.

13.

As of the filing of this complaint, Plaintiff's Mustang is still taking up space in his shop, preventing him from taking on other repair work. The Mustang is being stored in a 'rotisserie' which is a specialized rig that allows the car to be turned and worked on from all angles. It is impossible to move the vehicle and use the rotisserie again until all the repair work is completed. Plaintiff's standard storage rate is $125 per day. Due to the actions of Defendants, Plaintiff's Mustang has been stored in the rotisserie for at least 120 days. This has resulted in an economic loss to Plaintiff in an amount to be determined at trial, but not to exceed $45,625 (365 storage days at $125 per day).

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
(Unlawful Trade Practices – ORS 646.608(1)(e))

14.

Plaintiff re-alleges and incorporate Paragraphs 1-13 as if fully set forth here.

**COMPLAINT, page 7**

15.

By representing that 'Rage Ultra' and 'Rage Ultra XTRA' could be used for large body restoration work and have an extended work time, when, in fact, the products could not be used for such purpose, Defendants have engaged in an unlawful trade practice, as defined in ORS 646.608(1)(e).

16.

Defendants' actions have caused Plaintiff economic damages in the amount of $137,821,5 due to loss of business and extra labor time. Defendants have also caused Plaintiff $20,000 in non-economic damages due to inconvenience, and loss of use of Plaintiff's shop and personal vehicle.

## SECOND CLAIM FOR RELIEF
(Negligence)

17.

Plaintiff re-alleges and incorporate Paragraphs 1-13 as if fully set forth here.

18.

Mr. McKenney representing himself as a lab employee who is qualified to advise on mixing of products was negligent. If is foreseeable that having an employee misrepresent himself as a qualified lab technician would lead to customers such as Plaintiff taking that employee's advice and that such advice could lead to property damage. Defendant PPX, Inc. negligently failed to inform Plaintiff of the problems with 'Rage Ultra' and 'Rage Ultra XTRA'. It is foreseeable that having unqualified representatives advise customers about defective products would lead to such products causing damages.

19.

Defendants' actions have caused Plaintiff economic damages in the amount of $137,821,5 due to loss of business and extra labor time. Defendants have also caused

**COMPLAINT, page 8**

Plaintiff $20,000 in non-economic damages due to inconvenience, and loss of use of Plaintiff's shop and personal vehicle.

### THIRD CLAIM FOR RELIEF
(Product Liability – Failure to Warn)

20.

Plaintiff re-alleges and incorporate Paragraphs 1-13 as if fully set forth here.

21.

Defendants are strictly liable for the damages incurred by Plaintiff for failing to warn Plaintiff of the deficiencies of 'Rage Ultra' and 'Rage Ultra XTRA'. If the proper warnings about the products' usefulness were given, Plaintiff would not have used the products.

22.

Defendants' actions have caused Plaintiff economic damages in the amount of $137,821,5 due to loss of business and extra labor time. Defendants have also caused Plaintiff $20,000 in non-economic damages due to inconvenience, and loss of use of Plaintiff's shop and personal vehicle.

### FOURTH CLAIM FOR RELIEF
(Product Liability – indeterminate defect)

23.

Plaintiff re-alleges and incorporate Paragraphs 1-13 as if fully set forth here.

24.

'Rage Ultra' and 'Rag Ultra XTRA' contain defects in their design or manufacture that make them unusable for their intended purpose. Defendants are strictly liable for the damages caused to Plaintiff for this indeterminate defect.

25.

**COMPLAINT, page 9**

1

2    Defendants' actions have caused Plaintiff economic damages in the amount of

3    $137,821,5 due to loss of business and extra labor time. Defendants have also caused

4    Plaintiff $20,000 in non-economic damages due to inconvenience, and loss of use of

5    Plaintiff's shop and personal vehicle.

6                          **FIFTH CLAIM FOR RELIEF**
7                        (Implied Warranty of Merchantability)

8                                        26.

9    Plaintiff re-alleges and incorporate Paragraphs 1-13 as if fully set forth here.

10                                       27.

11   'Rage Ultra' and 'Rag Ultra XTRA' contain defects in their design or manufacture

12   that make them unusable for their intended purpose, breaching the implied warranty of

13   merchantability. Defendants are liable for the damages caused to Plaintiff for this

14   indeterminate defect.

15                                       28.

16   Defendants' actions have caused Plaintiff economic damages in the amount of

17   $137,821,5 due to loss of business and extra labor time. Defendants have also caused

18   Plaintiff $20,000 in non-economic damages due to inconvenience, and loss of use of

19   Plaintiff's shop and personal vehicle.

20

21                           **PRAYER FOR RELIEF**

22                                       29.

23   WHEREFORE, Plaintiff prays for the following relief:

24   1.    A money award entered against both Defendants for $157,821,5 representing

25         $137,821,5 in economic damages and $20,000 in non-economic damages, as

26         described above.

**COMPLAINT, page 10**

2.    Plaintiff's reasonable attorney fees associated with bringing this action, per
      ORS 646.641.

3.    Plaintiff's costs and disbursements associated with bringing this action.

4.    Any other relief the court may deem just and proper.


Respectfully submitted on 10/14/20


By: s/ Justin Steffen
     Justin Steffen, OSB#122411
     *Attorney for Plaintiff*
     Steffen Legal Services, LLC
     205 SE Spokane St.  #300
     Portland, OR 97202
     Tel:  971-570-9225
     info@steffenlegal.com

**COMPLAINT, page 11**

1
2
3
4        **IN THE CIRCUIT COURT OF THE STATE OF OREGON**
5        **FOR THE COUNTY OF CLACKAMAS**
6    **MARTY ORLUCK, dba COMPETITION**        **Case No. 20CV35387**
7    **AUTO BODY,**
8                Plaintiff,                    **SUMMONS**
9
10              v.
11   **ILLINOIS TOOL WORKS** and **PPX, INC.,**
12              Defendants.
13
14   **TO:   ILLINOIS TOOL WORKS**
              **c/o CT Corporation System**
15            **780 Commercial St. SE #100**
              **Salem, OR 97301**
16
17                    **NOTICE TO DEFENDANT:**
18                  **READ THESE PAPERS CAREFULLY!**
19
20   A lawsuit has been filed against you in the above-mentioned court by Marty Orluck,
21   Plaintiff. Plaintiff's claim is stated in the written Complaint, a copy of which is served upon
     you with this Summons.
22
23   You must appear in this case or Plaintiff will win automatically. To appear, you must file
24   with the court a written legal document called a "motion" or "answer." The motion or
25   answer must be given to the court clerk or administrator within 30 days after the day you
     were served this Summons, along with the required filing fee. It must be in proper form and
26   have proof of service on the Plaintiff's attorney.

     **SUMMONS, page 1**

1

2        If you have any questions, you should contact an attorney immediately. If you need

3    help in finding an attorney, you may contact the Oregon State Bar's Lawyer Referral Service

4    online at www.oregonstatebar.org or by calling (503) 684-3763 (in the Portland metropolitan

5    area) or toll-free elsewhere in Oregon at (800) 452-7636.

6        Dated: 10/16/20

7

8

9    By: _____

10          Justin Steffen, OSB#122411

11          *Attorney for Plaintiff*
       Steffen Legal Services, LLC

12          205 SE Spokane St. #300
       Portland, OR 97202

13          Tel: 971-570-9225
       info@steffenlegal.com

14

15

16

17

18

19

20

21

22

23

24

25

26

**SUMMONS, page 2**